IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STEVE MILLER and LETICIA MILLER, husband and wife, | ) ) ) | No. 35163-7-III |
| Respondents, | ) ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| DREW DALTON, individually, as a representative of the marital community, and as Partner/Member of Ford Law Offices, FORD LAW OFFICES, PS, a Washington Corporation, | ) ) ) ) ) ) | |
| Appellants, | ) ) | |
| STEPHEN FORD, individually, as a representative of the marital community and as Partner/Member of Ford Law Offices, | ) ) ) ) ) | |
| Defendants. | ) ) | |

FEARING, J. — Attorney Drew Dalton appeals from an adverse jury verdict in a

malpractice suit brought by his clients, Steve and Leticia Miller. Among other

assignments of error, Dalton claims the trial court erred in failing to grant a new trial or a

remittitur because of an excess verdict and the trial court erred in refusing to instruct the

jury on comparative fault and failure to mitigate damages. Steve and Leticia Miller cross

appeal the trial court's grant of summary judgment dismissing their Consumer Protection Act claim against Miller and grant of judgment as a matter of law precluding an award for emotional distress.

We grant each party partial relief and remand for a new trial on the issue of damages. We hold that the jury's verdict did not conform with the evidence and that the jury should have been permitted to award emotional distress damages. A majority of the court affirms dismissal of the Millers' Consumer Protection Act claim. Judge Siddoway's concurring opinion represents the majority opinion for the Millers' Consumer Protection Act cause of action.

## FACTS

We borrow the facts from trial testimony and, because of the numerous issues on appeal, quote extensive excerpts from the testimony. Although this suit sounds in professional negligence, the background illustrates the dire financial conditions many Americans faced during the Great Recession.

In 2006, Steve and Leticia Miller hired a contractor to build their dream home, at a price of $275,000, on forty acres in Rockford, a farming community twenty-four miles southeast of the city of Spokane and five miles west of the Idaho border. Steve and Leticia Miller have three young daughters. The Millers purchased the property in 1989 and lived in a mobile home on the land for two decades.

2

The Millers experienced a nightmare that many couples face when building a home. The final cost of the 3,400 to 3,600 square foot house more than doubled to approximately $550,000 to $640,000. The uncertainty in the actual costs results from the Millers not necessarily accounting for all construction work and materials they personally added to the home. The Millers fired the contractor because of unscrupulous practices that led to cost overruns. The Millers completed portions of the home on their own, although the home remains unfinished. According to one witness, 900 square feet of the home remains incomplete. In 2008, the Millers finished enough construction to procure a temporary occupancy permit.

In 2006, Steve and Leticia Miller procured a construction loan from the Bank of Whitman. With bank funds exhausted in 2008, the Millers charged some homebuilding expenses to credit cards.

In November 2008, Bank of Whitman issued a thirty-year home loan to Steve and Leticia Miller in the sum of $417,000 at 5.625 percent interest, payable at $2,400 per month. The monthly loan payment did not include insurance and tax payments. The home loan retired the construction loan and some credit card debt. Bank of Whitman secured the loan with a mortgage on the home and surrounding twenty acres. As was common practice, Bank of Whitman immediately sold the Millers' loan to SunTrust Mortgage.

3

One trial expert noted that Steve and Leticia Miller's monthly mortgage payment exceeded their ability to carry debt based on their income. Based on the income and debt, the Millers could only afford a mortgage no higher than $250,000. Steve Miller earned between $78,000 and $82,000 during this time. He was the only wage earner in the family.

Steve Miller used a small portion of the Bank of Whitman loan to purchase some corporate stock. We do not know the amount of the purchase or what, if any, gain or loss the Millers reaped or suffered from the stock. During trial, the following colloquy occurred between Steve Miller and Drew Dalton's counsel:

> Q. Now, you mentioned this stock that you purchased. Did it fluctuate quite a bit?
> A. It did.
> Q. And what were the fluctuations?
> A. Uh, it—it went up to 200 and—a little over $200,000. And it's—it's now—it's now in the—probably 10 to $15,000 is the value now.
> Q. Did you ever consider selling that to pay off your debt?
> A. Absolutely, I considered selling it.
> Q. And why didn't you sell it?
> A. I should have. I wish I would have. I wish I would have. It— it—fluctuated—it dropped precipitously, or—
> Q. Okay.
> A. —if I'd have known that, I would have sold it.

Report of Proceedings (RP) at 736-37.

Steve and Leticia Miller soon realized they could not afford their monthly payment and contacted SunTrust to negotiate a lower rate. At the same time, the value of

4

the unfinished Rockford home decreased below its cost as a result of the recession and a decrease in real estate values throughout the United States.

Steve and Leticia Miller sought assistance under the Home Affordable Mortgage Program (HAMP), a government program introduced as part of the emergency economic stabilization act of 2008 to respond to the subprime mortgage crisis. HAMP sought to abet financially struggling homeowners to avoid foreclosure by modifying loans to an affordable and sustainable level by reducing principal, changing an adjustable interest rate to a fixed rate, lowering the interest rate, and extending the length of payments. Steve Miller wrote to SunTrust Mortgage pleading for aid. By then the Millers had increased credit card debt of $25,000 and Steve Miller had taken a $50,000 loan from his retirement account. Steve's retirement account removed a sum from his monthly paycheck to retire the loan debt, so the couple's cash flow decreased with the account loan.

The Millers' loan qualified for the HAMP program. Drew Dalton's purported negligence arises from his representation of the Millers in effectuating a loan modification with SunTrust.

Under HAMP, the lender engages in the first step of a loan modification by issuing a "trial period plan payment" (TPP). Clerk's Papers (CP) at 35. If the borrower accepts the TPP and timely tenders three payments, the lender will offer an extended loan modification to the borrower if the borrower meets other criteria. The monthly payment

under the TPP may or may not be the final loan modification payment amount.

In July 2009, SunTrust offered Steve and Leticia Miller a TPP in the monthly payment amount of $2,113.13, which sum included payment into an escrow for taxes and insurance. The Millers remitted their first monthly payment but complained that the amount remained high and requested that SunTrust lower the amount further. SunTrust sent a second TPP in August 2009 with a monthly payment of $1,311.87, which amount did not include a sum to pay taxes and insurance. The Millers accepted SunTrust's second TPP offer and forwarded two monthly payments of $1,311.87.

In October 2009, SunTrust offered a permanent loan modification with different terms: monthly payments of $2,084.85 over thirty years at a lower interest rate of 3.625 percent. SunTrust demanded that Steve and Leticia Miller accept the modification offer by signing and returning the modification agreement by October 27, 2009. The Millers did not return the proposed agreement. By October 2009, the Millers had reduced the principal on the debt to $412,000.

Steve and Leticia Miller asked SunTrust why the offered permanent loan modification did not reflect $1,311.87 in monthly payments. SunTrust responded that it mistakenly calculated the $1,311.87 second TPP amount and that the Millers only qualified for a permanent modification with a $2,084.85 monthly payment. The dissatisfied Millers proceeded to attempt enforcement of a $1,311.87 monthly payment.

Over a window of two years, Steve and Leticia Miller contacted government

agencies and officeholders in an attempt to secure a $1,311.87 monthly payment to SunTrust. The Millers also hired attorney Brett Sullivan to assist. Sullivan wrote SunTrust Mortgage and insisted that the lender honor the $1,311.87 TPP sum, and SunTrust kindly responded by threatening foreclosure on the mortgaged property. In the meantime, Steve and Leticia Miller paid SunTrust the amount of $1,311.87 each month. In August 2010, SunTrust wrote to the Millers indicating the lender would no longer accept the lower payments. The Millers periodically sent the payment anyway. Sometimes SunTrust accepted the payment and sometimes the lender rejected the payment.

By April 2012, Steve and Leticia Miller had still not resolved their disagreement with SunTrust Mortgage. SunTrust Mortgage again threatened to foreclose on the property. Steve Miller's father had previous employed Stephen Ford to prepare a will. Steve called Ford and Ford recommended that Miller speak with Ford's new trial associate attorney, Drew Dalton, who had experience in this subject area. The Millers then hired attorney Drew Dalton.

Steve Miller testified that Drew Dalton wanted the Millers to agree to a contingent fee arrangement:

> Q. Did [Dalton] talk to you about the fee arrangement in that conversation, then, at his office?
> A. I—that's—I believe that's where we—
> Q. All right.

A. —that he said the 30—the—he would do it—the—take the case on a 30 percent contingency—a 70/30 contingency.

Q. All right. And did he—when he said that he would take the case on a 70/30 percent contingent fee, did he explain to you that you had any obligation to pay any money to him in addition to the 30 percent?

A. No. All he—no. No. All he said was his seven - —he'll—he'll do the—he'll take the case on a 70/30 contingent fee and just to bring in a $500 retainer.

Q. Uh-huh.

A. And he said—he said there may be some filing fees; it—it might amount to a couple hundred dollars and that I might share those, but he wasn't sure at that point.

Q. Okay.

A. That's all he said.

Q. So did he tell you in the 30 percent contingent fee that he was only going to take your case through trial or through appeal, or did he put any limitation on the amount of work he was going to do for his 30 percent?

A. No. We didn't discuss any of those details.

RP at 593-94.

Steve Miller assumed his oral agreement with Drew Dalton meant Dalton would receive thirty percent of any final judgment against SunTrust. Dalton testified that Steve Miller signed a contingent agreement. The confusing testimony may, however, be that Miller signed one of two attorney retainer agreements.

Q. Had you ever given him a written [contingent] fee agreement?
A. I had
Q. And did you ever see him sign one?
A. I thought he did sign one, yes.
Q. How many times did you give him a written fee agreement?
A. There's at least two times I recall discussing the written fee agreement with him,
Q. But he never signed it?
A. He never signed it.

8

RP at 834. In addition to a contingent fee arrangement, Steve and Leticia Miller paid a $500 retainer at the request of Dalton.

On April 16, 2012, Drew Dalton, on behalf of Steve and Leticia Miller, sent a letter to SunTrust Mortgage, which correspondence demanded that SunTrust honor the second TPP offer of a monthly payment of $1,311.87 for the remainder of the thirty-year mortgage. Dalton threatened to file suit on behalf of the Millers if SunTrust failed to respond by April 30.

On May 14 and 16, 2012, SunTrust Mortgage attorney Leigh Peplinski spoke by telephone to Drew Dalton regarding a forthcoming settlement offer to Steve and Leticia Miller. During the May 16 conversation, Peplinski identified the terms of the offer that would arrive in a forthcoming letter. Dalton testified at trial that he called Steve Miller and informed him of the potential settlement offer, recommended acceptance of the offer, and stated Miller should expect a letter shortly.

During trial, Steve Miller testified that Drew Dalton notified him that SunTrust Mortgage expressed a willingness to permit a monthly payment of $1,311.87. Steve told his wife Leticia about his conversation with Dalton. After three years of struggling, the Millers were "ecstatic" at the prospect of SunTrust agreeing to a monthly payment of $1,311.87 at two percent interest.

Drew Dalton received a written settlement offer from SunTrust Mortgage on May 21, 2012. The offer remained open for fifteen days and expired without the Millers signing it. Steve and Leticia Miller claim Drew Dalton never forwarded a copy of the SunTrust letter to them.

Drew Dalton testified:

> Q. And what did you do when you got that [the SunTrust settlement offer letter]?
> A. The first thing I did is I called Mr. Miller.
> Q. All right. Tell the jury about what you told Mr. Miller when you got this letter, what did you do?
> A. Well, I said, "Steve, we have an offer to settle. I have it here in writing in front of me. Do you want me to send you a copy via email or do you want to come down and discuss it with me? Or do you want me to read it to you over the phone?" He said, "Read it to me over the phone," he wanted to know what the terms were.
> So I went and I read him the terms, the important terms being that there would be a permanent modification and it will be a fixed rate, nonescrowed loan. Nonescrowed meaning they were not going to pay the taxes and insurance. And—
> Q.—Who wasn't going to pay the taxes and insurance?
> A. SunTrust was not going to pay the taxes and insurance.
> Q. Okay.
> A. And that the Millers would be responsible for making timely payment of the taxes and insurance. That the principal and interest payment would be $1,311.87 a month. The interest rate of 2 percent, 448 months, first payment due August 1, 2012. And the new unpaid principal balance would be $413,837.71.
> It went on to say that SunTrust had held some payments they had received from Mr. Miller and that they would apply that balance of $9,183.09 towards the negative escrow balance, reducing the unpaid principal balance. And that if the Millers accepted we needed to respond within 15 days in writing and that they would send the documents back that we needed to make this work.
> Q. All right. So you went over that with him on the phone?

A. I did.

Q. And did you tell him about the deadline?

A. I told him about the deadline. I told him, "We have 15 days to respond. That's approximately June 5, 2012. And we need to decide if we want to do this."

Q. Okay. And what, did you recommend it to him?

A. I did recommend it. I said, "This is a good offer. You should seriously consider taking it.

Q. Okay. And why did you recommend it?

A. Because it got his principal and interest at $1,311.87. It reduced his interest rate and it got him at a more affordable rate into his house.

Q. Okay. And did you explain to him what his options were then?

A. I explained some of his options at the time. We had talked a lot about his options. But we briefly went over some of the options, yes.

Q. Okay. And did you talk with him about the taxes and insurance being separate, being something the Millers would have to pay?

A. I did. And he was, he understood. I said, "Steve, the taxes and insurance aren't included like you want." He was, like, "I know." And I said, "Can you afford to do that?" And he said it would be difficult.

Q. Okay. Did he tell you to accept the offer?

A. He did not.

RP at 824-26.

According to Drew Dalton, Steve Miller wanted clarification before responding to SunTrust Mortgage's May offer, regarding whether the $1,311.87 monthly payment would include therein an amount to pay insurance and taxes. Dalton unsuccessfully attempted to clarify this subject with SunTrust. Nevertheless, according to Dalton, he also told Steve and Leticia Miller that SunTrust's offer could be revoked if the Millers attempted to negotiate more favorable terms. Dalton testified at trial that, in early June 2012 before SunTrust's offer expired, he called Steve Miller and warned:

11

A. I said, "Steve, they haven't called us. They haven't given any clarification at this point. I have no answers for you on the points you want. It's been 15 days. We can still write and accept this offer, or we can continue to try and clarify."

RP at 829. Dalton did not bill for any phone call to the Millers in early June, nor did he memorialize by writing any conversation with Steve or Leticia Miller. Steve Miller denies that either telephone conversation with Drew Dalton occurred.

According to Drew Dalton, Steve and Leticia Miller never authorized him to accept SunTrust Mortgage's May 2012 settlement offer. Dalton continued to represent the Millers and assured the married couple he resumed efforts to secure a favorable outcome from SunTrust.

In September 2012, SunTrust filed suit to foreclose on Steve and Leticia Miller's Rockford property. Drew Dalton prepared and filed a counterclaim against the lender. The counterclaim did not claim that the parties reached a settlement agreement in May 2012. Steve Miller testified that Dalton immediately discussed possible counterclaims in and favorable outcomes of the foreclosure action.

On April 5, 2013, Drew Dalton sent by mail a new fee agreement to Steve and Leticia Miller, which proposed agreement differed from the terms of the original oral, or perhaps written, contingent fee agreement. With an accompanying letter, Dalton wrote:

Here's an updated fee agreement we need to discuss. Not all applies, but it does help. I also need to get a $10,000 retainer to get your file moving. I think we have a good case, but at this point I need funds to push the case. Thank you, Drew.

12

RP at 623-24. The proposed agreement also stated that Drew Dalton would charge $350 per hour, the Millers would receive a monthly bill, and any amount owed was payable on receipt of the bill. The agreement and letter did not explain the need for a $10,000 retainer or for hourly charges when Dalton had earlier consented to a contingent fee arrangement. When the parties earlier agreed to a contingent fee method of payment, Dalton had only mentioned the need to pay several hundreds of dollars for costs. On April 5, Dalton did not advise the Millers that they had the right to refuse his offer to change their fee arrangement, and he did not recommend that the Millers seek independent counsel to review his proposed new agreement. Steve Miller did not know then that Drew Dalton was not "moving" his file. RP at 640.

Steve Miller informed Drew Dalton that the Millers lacked $10,000 to pay Dalton. Miller also complained that payment of $10,000 conflicted with the earlier contingent fee agreement.

Around April 5, 2013, Drew Dalton notified Steve Miller that he hired two expert witnesses, Alan Hurd, a mortgage broker, and Frank Malone, an attorney. Dalton claimed the Millers needed the assistance of the experts to win against SunTrust Mortgage. Dalton added that the experts had already commenced work and needed payment. Contrary to the representation, Dalton hired Malone as co-counsel, not as an expert witness. Steve Miller assumed that Malone would perform as co-counsel, but

13

Dalton never disclosed to Miller any fee arrangement with Malone.

In response to this notification, Steve Miller telephoned Frank Malone and asked him to work on a contingent fee basis. Miller's call to Malone prompted an April 9, 2013 e-mail from Drew Dalton to Miller, in which Dalton asked Miller to meet with Dalton, Frank Malone, and Alan Hurd. Dalton added in the message that he could not ask Malone or Hurd to work on a contingent fee basis. Dalton wrote:

> "It's coming off to us that you want no risk in this litigation. Unfortunately, that's just not the case. Despite my original percentage agreement with you, I cannot continue to operate without spending money."

RP at 645. Dalton instructed Miller not to contact Malone directly. Miller then felt strong-arm pressure from Drew Dalton.

On April 10, 2013, Alan Hurd, Frank Malone, Drew Dalton, and Steve Miller met in Hurd's downtown Spokane office. Miller's eighty-four-year-old father accompanied him. Dalton insisted on payment of $55,000, not just $10,000, but spoke about Hurd, Malone and him affording Miller a $55,000 loan to be secured with the twenty acres of unencumbered land owned by Steve and Leticia Miller adjacent to their Rockford home acreage. Miller did not then know that Frank Malone had already billed Drew Dalton for services performed.

During the April 10 meeting, Drew Dalton mentioned that the lawsuit against SunTrust Mortgage was worth $300,000 to $500,000. Steve Miller suggested that Dalton and the experts work on a fifty percent contingent fee basis. Drew Dalton appeared

14

willing to accept Miller's proposal, but Frank Malone rejected the proposal. Dalton and Alan Hurd then mentioned that they could await payment of the loan amount until after the completion of the lawsuit and the recovery in the suit would suffice to repay the loan. The parties reached no agreement on April 10.

On April 11, 2013, Steve Miller sent an e-mail message to Drew Dalton. Miller informed Dalton that he needed Dalton to conform to the initial thirty percent contingent fee agreement because Miller would owe tens of thousands of dollars of income tax with any loan reduction. Dalton responded with an e-mail on April 11. The e-mail message read:

> "We're moving forward with the litigation. I will prepare a detailed agreement."
>
> . . . .
>
> "We are taking a cash payment. And the 50/50 at this time is off the table."
>
> . . . .
>
> "Please be aware, if this goes to litigation, there may be an escalation clause to 40 percent 60 days before trial. That is standard in all contingent agreements."

RP at 655-57. Dalton had never before mentioned an escalation of the contingent fee. Steve and Leticia Miller still did not know that SunTrust Mortgage had sent a settlement proposal to the Millers, through Dalton, on May 15, 2012. During trial in the pending suit, the Millers' expert on the attorney's standard of care testified that Dalton's demands constituted an egregious breach of Dalton's fiduciary duties.

Within days, Steve Miller received a call to come to Drew Dalton's office to sign

15

papers. Steve and Leticia Miller went to Dalton's office and met with Stephen Ford, Dalton's law partner. Under the paperwork, Pacific Mortgage, Alan Hurd's business, loaned $30,000 to the Millers at thirteen percent interest with payment of $300 per month beginning immediately. The twenty acres would secure the loan. Steve Miller had never discussed these terms before with Drew Dalton, Frank Malone, or Alan Hurd. Leticia Miller asked Ford some questions, to which Ford lacked answers. Leticia walked out of the office. Steve stayed to speak with Ford and told Ford that the thirteen percent interest was outrageous. Ford had no response, so Steve also left the office.

On May 9, 2013, Steve Miller sent Drew Dalton another e-mail message. Miller objected to the strong arm tactics of Dalton and Dalton attempting to shame Miller into changing the original contingent fee agreement. Miller lamented Dalton's threats to Miller that Miller will not receive any money unless he pays Dalton and the experts. Miller complained that immediate $300 per month payments and thirteen percent interest was outrageous and never discussed at the April 10 meeting.

Drew Dalton responded with an e-mail message on May 9. Dalton professed no knowledge of the terms of the proposed loan. Dalton directed Steve Miller to contact Alan Hurd about the loan terms. Dalton additionally wrote:

> "I have not changed the contingency. Our agreement was a third and 40 percent if trial."
> . . . . "I do not pay any costs without some commitment from the client."
> . . . .

16

> "With the money now available, we can make a demand that gets you the best possible leverage. I want to work this out, but I feel like you want me to take all the financial risk."
>
> . . . .
>
> "That can't work. I'm over 15,000 into this file. I have not charged a dime until settlement."

RP at 668-71. Nevertheless, the initial agreement established a thirty percent, not 33 1/3 percent contingent fee, and never mentioned an escalator if trial proceeded. The agreement did not require any commitment from Steve and Leticia Miller to pay costs. Steve Miller felt betrayed by Drew Dalton.

Steve Miller deemed himself pressured to pay some money to Drew Dalton. Miller received $5,000 from his father that he paid Dalton. Dalton has never accounted for the receipt or use of the $5,000.

SunTrust Mortgage's lawsuit to foreclose on its mortgage proceeded. In September 2014, the Spokane County Superior Court entered a judgment in favor of SunTrust Mortgage and against Steve and Leticia Miller for the amount of $513,626.91. Interest accrued annually at 5.625 percent, which accrued daily on the judgment at the rate of $62.09. By January 1, 2017, the judgment debt had increased to $566,086.00. But if the Millers had monthly paid the $1,311.87 figure on the judgment through January 1, 2017, the judgment amount would have decreased to $496,557.00. The court also entered an order foreclosing on the Rockford property. The trial court also ruled that, if the foreclosure sale price deceeded the judgment amount, SunTrust could not obtain a

deficiency judgment. The Superior Court dismissed the Millers' counterclaims. This court affirmed the Spokane County Superior Court rulings.

During the pendency of the SunTrust Mortgage litigation, Steve and Leticia Miller, at Drew Dalton's request, paid Dalton another $8,500 in fees. Dalton then applied the payment to an hourly rate of fees. The Miller's expert on attorney ethics testified that Dalton breached his fiduciary duty by retaining hourly rate fees in a contingent fee case.

In November 2015, Steve and Leticia Miller filed for Chapter 13 bankruptcy protection. In addition to the mortgage debt to SunTrust, the Millers held $90,000 in other debt, $40,000 in credit card debt, and $50,000 due to Steve Miller's retirement account. The credit card debt carried sixteen to seventeen percent interest. The Millers filed bankruptcy to stay the foreclosure sale on their home. In the bankruptcy asset list, the Millers valued their home at $490,000.

PROCEDURE

Steve and Leticia Miller filed suit against Drew Dalton and his law firm and alleged negligence, breach of fiduciary duty, and Consumer Protection Act violations. The trial court granted Dalton's summary judgment dismissing the Millers' claim for emotional distress damages, but denied the motion to dismiss the Millers' Consumer Protection Act claim. The trial court also denied Dalton's motion to preclude testimony from the Millers' two daughters regarding the Millers' living conditions while they awaited completion of their Rockford residence.

During trial, daughter Alisa Miller testified:

Q. . . . All right. So how do you like living out in the country?
A. I love it. It's awesome. It's at—it's at the end of a dirt road, and our driveway, we always joke no one is ever going to steal anything from our house because no one would dare come up our driveway. There's potholes and loose gravel. But I love it. We—I grew up around animals. We raised cattle and sheep and horses, and it was—it was a lot of work and a lot of responsibility, but it was a lot of fun.
. . . .
Q. And how was it living in the single wide mobile home during that time?
A. It was diffi-—I mean, it's the first house I've lived in, so, I mean, we didn't complain, but it was—it was difficult. It was five people and one bathroom and two bedrooms.
Q. Okay
A. So I had to share a bedroom with my two sisters. So, I mean, it was difficult.
Q. All right. And when you—was there a point of time at which you learned that your mom and dad were going to be able to build a regular house to make a home for you?
A. Yeah. It was—
Q. Tell us about how you found out about that.
A. It was the year before that. My parents brought us into the living room slash kitchen slash bedroom, and they told me and my sisters that we were going to get a new house. And—and we were all ecstatic, of course. I immediately thought, I'm going to get my own room finally.
Q. And then tell us about the time that the house was being built. What do you remember about that time?
A. I remember the foundation was laid, and my parents—my parents brought me and my sisters, and they took us over the foundation and they told us where everything was going to be. They planned it all out. They had planned thoroughly everything, every little detail. They said, "your room is going to be here, and the kitchen is going to be here, and we're going to have room to breath." And that's my main—
Q. How did you feel about the anticipation of having a new home?
A. Oh, we were all thrilled. I was thrilled. I was ecstatic.
Q. Now, eventually the home got finished to the point that you could move in. Tell us what you remember about moving in.

A. Well, it was—it was still unfinished, but I loved it. I loved every part of the house. I mean, I—I was there when—every step of the way when it—when it was being built. And I watched my parents put in the hardwood floors by hand. I watched them put in the decks by hand. They put a lot of work into this house, and unfortunately we couldn't finish it, but, you know, I didn't care. My sisters and I didn't care.

. . . .

Q. Okay. And was there a point that you became aware that there was some issues around the—how the house was going to be paid for or financed?

A. I think my parents tried to shield us from everything that was going on, most of it, but, yeah, I mean, we heard the arguments, and they seemed very panicked about the whole situation.

Q. And did you in talking to your parents get the sense of how hard they were working to keep this home for your—for you and your family?

A. Yes.

Q. Tell us about that.

A. They—yeah, they sacrificed a lot to make—to try and—save the house. My dad—both of my parents, they were—they were waiting for— they were always trying to talk to different people trying to figure this out, you know, trying to do anything they could to—to save the house.

RP at 385-90.

Alisa Miller was fifteen years old during the moments described and nineteen years old during her testimony. Alisa's younger sister, Briana Miller, provided similar testimony. Leticia Miller testified regarding the emotional impact of the dispute with SunTrust Mortgage and Drew Dalton's actions.

Steve and Leticia Miller proffered economist Eric Knowles as a damages expert. He specializes in forensic economic consulting and provides opinions as to damages in tort cases. Knowles reviewed the SunTrust Mortgage documents, the May 2012 letter, SunTrust's judgment against Steve and Leticia Miller, the decree of foreclosure on the

20

Rockford home, and the order of sale. He assumed that the Millers would have accepted the May 15, 2012 offer from SunTrust and stayed in their home.

Eric Knowles first suggested that the jury award the judgment amount of $513,626.91 to Steve and Leticia Miller, plus interest on the judgment amount. With interest, the amount owed was $566,000.00 as of trial. Knowles noted that, if the bankruptcy stay was lifted, Steve and Leticia Miller would need to pay the sum or $566,000.00 to save the home from foreclosure. Such a payment would pay for the mortgage in full with no additional future payments. They could not prevent foreclosure by paying a monthly amount. He added that the Millers lack the financial strength to obtain a loan for the judgment amount.

Eric Knowles observed that the amount of payments not made by Steve and Leticia Miller between August 1, 2012, to the date of trial was $69,000. Knowles did not know the amount of equity the Millers held in the property as of trial or the amount of equity the Millers would have had if they had accepted the May 2012 offer from SunTrust.

Paul Murray, a real estate broker, also testified for Steve and Leticia Miller. He often appraises real estate. He viewed the Millers' residence in an unfinished state. He valued the home between $620,000 and $650,000, but only if completed as planned. In an earlier deposition, Murray testified to a value between $595,900 and $620,000. In its unfinished state at the time of trial, according to Murray, the home's value ranged from

21

$555,000 to $575,000. Murray does not know the cost to complete the unfinished portion of the home. According to the Millers' economist, Eric Knowles, the value of the property lacked relevance to Steve and Leticia Miller's damages.

Drew Dalton employed Neil Beaton as an expert economist. Beaton holds licenses or certifications as a certified public accountant, business evaluator, property appraiser, and financial forensics expert. Dalton requested that Beaton assess Steve and Leticia Miller's financial condition, to determine the Millers' ability to pay the mortgage loan, and to measure the Millers' damages. Beaton reviewed the Millers' tax returns, asset and liability bankruptcy disclosures, and loan documents.

According to Neal Beaton, most lenders want the borrower to maintain a debt to income ratio of forty-three percent. Steve Miller's income in 2008 was $3,710.00 and the payment on the mortgage was $2,400.49, not including taxes and insurance. Beaton calculated the debt to income ratio as being 59.8 percent, which must include adding some taxes and insurance or other debt to the mortgage debt. With the mortgage payment modification to $1,311.87 in 2009, the Millers' debt to income ratio decreased to 42 percent. In 2011, the ratio decreased further to 39.9 percent. Thereafter, their 2015 taxes increased, and the Millers bordered on the cusp of an acceptable or affordable debt to income ration of around 42 percent assuming a monthly mortgage payment of $1,311.87.

Neal Beaton faulted Steve and Leticia Miller for failing to segregate into an account the $1,311.87 payments rejected by SunTrust Mortgage and accruing interest on

the saved money. After all, assuming the Millers reached an agreement with SunTrust, the Millers would have still needed to pay on the mortgage beginning in May 2012. Neal Beaton also faulted the Millers for failing to pay some of the real estate property taxes. Some other party, presumably SunTrust, paid the taxes, in the aggregate sum of $17,000, from 2011 to 2015.

According to Neal Beaton, any failure of Drew Dalton in consummating a settlement with SunTrust Mortgage damaged Steve and Leticia Miller $140,000 or $268,000 depending on the facts the jury found. Beaton arrived at the $140,000 figure by accepting the Millers' bankruptcy valuation of the home of $490,000 in November 2015. Beaton assumed the value of the home increased 6.1 percent through 2016, for a value of $520,000. If the Millers had accepted SunTrust Mortgage's offer of $1,311.87 payments in May 2012, the couple would have retired the principal debt by the end of 2016 to $380,000. The lost equity in the home was therefore $140,000. According to Beaton, $140,000 would be the sum needed to make the Millers whole from any professional negligence by Drew Dalton.

Neal Beaton arrived at the $268,000 damage sum by first observing that, if Steve and Leticia Miller had paid the monthly sum of $1,311.87 on the September 2014 judgment debt of $519,626.91, the Millers would have owed $496,557 on the judgment as of January 1, 2017. Beaton then determined that a $1,311.87 monthly payment would

23

service a mortgage debt in the initial sum of $227,891, not including the need to pay taxes and insurance. Deducting $227,891 from $496,557 leaves $268,666.

According to Neal Beaton, an award of $369,000, as suggested by Steve and Leticia Miller's expert Eric Knowles, would give the Millers a windfall. The sum would in essence result in the Millers paying no mortgage.

During trial, Drew Dalton examined Neal Beaton about other loan modifications proposed by SunTrust Mortgage.

> Q. (By Ms. McIntosh) [Drew Dalton counsel] So your assumptions you used the, actually the 1,311 figure for your analysis to get to your $260,000?
> . . . .
> THE WITNESS: That's correct.
> Q. (By Ms. McIntosh) And if the Millers had accepted some other modification it would change what their damages would have been?
> . . . .
> THE WITNESS: Again, to me again economically there's a duty to mitigate. And so if there were other offers that could have been taken that may not have been the 1,311.87, but lower than the 2,400, which was the original, that, of course, would reduce the overall as we're sitting here now of 513 or 566,000. So clearly it would have had an offsetting impact on the total damages that we're sitting here today.

RP at 1055-56.

After the completion of testimony, the trial court granted Drew Dalton dismissal of Steve and Leticia Miller's Consumer Protection Act claim. Drew Dalton requested the trial court to instruct the jury to assess comparative fault against Steve and Leticia Miller and to reduce any damage award based on the Millers' failure to mitigate damages. In so

24

arguing, Dalton highlighted testimony from his expert Neal Beaton that the Millers agreed to assume loan payments they could not afford. Also, in 2006, before constructing the home, Steve Miller purchased a truck for $50,000, in part because of the need for a vehicle with four-wheel drive because of the snow that accumulated at the Rockford location. Finally, according to Dalton, Steve Miller made imprudent stock decisions, including failing to sell assets valued at $200,000, which would have prevented a foreclosure on the Rockford home. Eventually, the trial court denied instructing the jury on comparative fault and failure to mitigate on the basis that the evidence did not support either affirmative defense.

In jury instruction 9, the trial court instructed the jury as to damages to award Steve and Leticia Miller. The instruction read in part:

> If your verdict is for Steve and Leticia Miller on the legal malpractice claim, then you must determine the amount of money that will reasonably and fairly compensate Steve and Leticia Miller for such damages, if any, as you find were proximately caused by the negligence of Drew Dalton.
> If you find for Steve and Leticia Miller on the legal malpractice claim, you should consider the amount of economic loss actually sustained and the award necessary to restore Steve and Leticia Miler to the position they would have been in if Drew Dalton had met the standard of care.

Clerk's Papers (CP) at 815. Drew Dalton did not object to this instruction.

The jury awarded Steve and Leticia Miller $503,557 in economic damages. The verdict included $7,000 in damages on the breach of fiduciary duty claim and $496,000 on the negligence claim.

Drew Dalton surmised that the award of damages for negligence reflected the amount of the judgment in favor of SunTrust plus interest, an amount of $566,086, minus the mortgage payments that Steve and Leticia Miller would have paid from the date of the purported acceptance of the loan modification until trial, an amount of $69,529. Dalton fretted that the verdict ignored the need for the Millers to pay decades of monthly payments had they accepted the SunTrust Mortgage modification offer. Stated differently, the Millers could never have saved the home from foreclosure without paying on a reduced mortgage sum.

Drew Dalton moved for a new trial, or in the alternative, a remittitur equal to the maximum amount of damages that Steve and Leticia Miller could have received if the jury had not failed to recognize that the Millers needed to pay on the mortgage if Dalton had effectuated the settlement proposal from SunTrust Mortgage. The trial court denied the motion for a new trial and remittitur.

## LAW AND ANALYSIS

Both parties appeal rulings of the trial court. Drew Dalton contends the trial court erred when it failed to grant a new trial or remittitur because the jury award included damages not available under the law. Dalton also contends the trial court erred in refusing to instruct the jury on the contributory negligence of Steve and Leticia Miller and the Millers' failure to mitigate damages. Finally, Dalton maintains that the trial court erred in allowing the Millers' daughters to testify to their emotional distress.

26

Steve and Leticia Miller contend, on appeal, that the trial court erred in granting

Drew Dalton summary judgment dismissal of the Millers' request for an award of

emotional distress damages resulting from the negligence of Dalton. The Millers also

argue that the trial court erred when dismissing their Consumer Protection Act claim at

the conclusion of trial. We first address questions that involve liability, or the extent of

liability, and then issues that entail the nature and amount of damages available. We

crisscross assignments of error presented by the Millers and presented by Drew Dalton.

Consumer Protection Act Claim

Steve and Leticia Miller assign error to the trial court's grant of judgment as a

matter of law to Drew Dalton on their Consumer Protection Act claim at the close of trial

testimony. The majority of the court affirms this dismissal. The author of this lead

opinion dissents from the majority's ruling on this claim. The opinion written by Judge

Siddoway should be considered the controlling opinion for purposes of the Millers'

Consumer Protection Act cause of action, and this opinion should be considered a dissent

on this cause of action.

We review judgments as a matter of law de novo. *Faust v. Albertson*, 167 Wn.2d

531, 537, 222 P.3d 1208 (2009). Judgment as a matter of law is appropriate only when

no competent and substantial evidence exists to support a verdict. *Guijosa v. Wal-Mart

Stores, Inc.*, 144 Wn.2d 907, 915, 32 P.3d 250 (2001). We construe all facts and

27

reasonable inferences in favor of the nonmoving party. *Yakima Fruit & Cold Storage Co. v. Central Heating & Plumbing Co.*, 81 Wn.2d 528, 530, 503 P.2d 108 (1972).

Steve and Leticia Miller contend that evidence supported Drew Dalton engaging in the following unfair and deceptive acts and practices:

1. Dalton misrepresented his experience in the area of HAMP cases;

2. Dalton entered an oral contingent fee agreement with Steve and Leticia Miller in violation of the attorney code of ethics;

3. Dalton failed to convey to the Millers a favorable offer of settlement that they would have accepted and which would have avoided extensive litigation;

4. Dalton failed to accept the May 15, 2012 offer from SunTrust Mortgage because he would not make any money on the settlement offer and he believed he would gain a larger fee on a counterclaim that he pursued on behalf of the Millers;

5. After failing to accept the SunTrust Mortgage offer and thereby committing malpractice, Dalton held a conflict of interest that he did not disclose to the Millers because he hoped in obtaining a larger fee in the litigation;

6. Dalton agreed to represent the Millers on a 70/30 contingent fee agreement, but then engaged in a bait and switch tactic when insisting that the Millers sign a contingent fee agreement for a higher amount;

7. Dalton agreed to represent the Millers on a contingent fee agreement, but he collected money from the couple for which he provided no accounting or that he applied

28

to hourly fees;

8. Dalton attempted to change the fee agreement without advising the Millers that they held no obligation to modify the fee agreement;

9. Dalton misrepresented to the Millers that he could unilaterally increase the contingent fee amount;

10. Dalton misrepresented to the Millers that their payments covered expert costs but he applied the money to his hourly fees;

11. Dalton insisted that the Millers sign a promissory note at 13 percent interest secured by other real estate in order to raise money for experts, despite Dalton hiring no expert; and

12. Dalton continually misrepresented to the Millers the need to continue the litigation with SunTrust Mortgage when he knew that SunTrust Mortgage had presented the Millers an acceptable offer to settle.

RCW 19.86.020, an opening section of Washington's Consumer Protection Act, declares unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." The five elements of a private Consumer Protection Act action include: (1) an unfair or deceptive act or practice, (2) in the conduct of trade or commerce, (3) which impacts the public interest, (4) injury to the plaintiffs in their business or property, and (5) a causal link between the unfair or deceptive act and the injury suffered. *Mason v. Mortgage America, Inc.*, 114 Wn.2d 842,

852, 792 P.2d 142 (1990). Persons who are injured by such prohibited practices may bring a private action to recover damages and the costs of the suit, including attorney fees. *Bowers v. Transamerica Title Insurance Co.*, 100 Wn.2d 581, 591, 675 P.2d 193 (1983). We must decide if Steve and Leticia Miller forwarded evidence to support each of the five elements.

*Issue 1: Did the Millers present evidence sufficient to create a question of fact as to Drew Dalton committing an unfair or deceptive act and practice?*

*Answer 1: Yes.*

A defendant commits a per se unfair or deceptive act under the Consumer Protection Act if the plaintiff shows that the conduct violates a statute declaring the conduct to be an unfair or deceptive act or practice in trade or commerce. *Hangman Ridge Training Stables, Inc. v. Safeco Title Insurance Co.*, 105 Wn.2d 778, 786, 719 P.2d 531 (1986). If a defendant's act or practice does not violate a statute, the plaintiff must show the conduct is "unfair" or "deceptive" under a case-specific analysis of those terms. *Klem v. Washington Mutual Bank*, 176 Wn.2d 771, 785-87, 295 P.3d 1179 (2013). Because the act does not define "unfair" or "deceptive," Washington courts have allowed the definitions to evolve through a gradual process of judicial inclusion and exclusion. *Saunders v. Lloyd's of London*, 113 Wn.2d 330, 344, 779 P.2d 249 (1989).

Washington case law has established guiding criteria regarding the nature of an "unfair" act or practice. For example, in *Magney v. Lincoln Mutual Savings Bank*, 34

30

Wn. App. 45, 659 P.2d 537 (1983), the court reviewed three criteria, which the Federal

Trade Commission utilizes to determine whether a practice or act is "unfair":

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

*Magney v. Lincoln Mutual Savings Bank*, 34 Wn. App. at 57 (quoting *Federal Trade Commission v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5, 92 S. Ct. 898, 31 L. Ed. 2d 170 (1972). Current federal law suggests that a "practice is unfair [if it] . . . causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits." Federal Trade Commission Act of 1914, 15 U.S.C. § 45(n).

The Consumer Protection Act also does not define the term "deceptive," but our Supreme Court has declared that "[d]eception exists 'if there is a representation, omission or practice that is likely to mislead' a reasonable consumer." *Panag v. Farmers Insurance Co.*, 166 Wn.2d 27, 50, 204 P.3d 885 (2009) (quoting *Southwest Sunsites, Inc. v. Federal Trade Commission*, 785 F.2d 1431, 1435 (9th Cir. 1986). To prove that a practice is deceptive, neither intent to deceive nor actual deception is required. *Panag v. Farmers Insurance Co.*, 166 Wn.2d at 47. The question is whether the conduct has the capacity to deceive a substantial portion of the public. *Panag v. Farmers Insurance Co.*,

166 Wn.2d at 47. An act or practice can be unfair without being deceptive. *Rush v. Blackburn*, 190 Wn. App. 945, 963, 361 P.3d 217 (2015).

A "bait and switch" tactic, by which the seller offers to sell one product only to draw the customer to another more profitable product, can violate the Consumer Protection Act. *Walker v. Wenatchee Valley Truck & Auto Outlet, Inc.*, 155 Wn. App. 199, 214-15, 229 P.3d 871 (2010). Deceptive billing practices can constitute an unfair or deceptive act or practice under consumer protection law. *Logan v. LaSalle Bank National Association*, 80 A.3d 1014, 1027 (D.C. 2013). Intentional nondisclosure of material facts may also be an unfair or deceptive act or practice. *Grossman v. Waltham Chemical Co.*, 14 Mass. App. Ct. 932, 436 N.E.2d 1243, 1245 (1982).

The Millers claim that Drew Dalton committed a per se unfair or deceptive act or practice because he violated Washington's usury statute, RCW 19.52.020, by insisting on thirteen percent interest on a proposed loan. I note, however, that the Millers never signed a promissory note with thirteen percent interest. RCW 19.52.030, one of the usury statutes, only applies if the parties enter a loan agreement. For the usury laws to apply, there must be a loan or forbearance of money. 44B AM. JUR. 2D *Interest and Usury* § 64 (2018). Therefore, the Millers sustain no claim for a per se unfair or deceptive act or practice.

I conclude, however, that a trier of fact could find, based on trial testimony, that Drew Dalton engaged in one or more other unfair or deceptive acts or practices as listed

by the Millers. I would not preclude a trier of fact from determining that pressure to enter

a usurious loan agreement otherwise constitutes an unfair or deceptive act and practice.

*Issue 2: Did the Millers present evidence sufficient to create a question of fact as*

*to whether Drew Dalton's alleged misconduct occurred in trade or commerce?*

*Answer 2: Yes.*

RCW 19.86.010(2) defines "[t]rade" and "commerce" as including "the sale of

assets or services, and any commerce directly or indirectly affecting the people of the

State of Washington." Certain entrepreneurial aspects of the practice of law fall within

the "trade or commerce" definition of the Consumer Protection Act. *Short v. Demopolis*,

103 Wn.2d 52, 61, 691 P.2d 163 (1984). Entrepreneurial aspects include "how the price

of legal services is determined, billed, and collected and the way a law firm obtains,

retains, and dismisses clients." *Short v. Demopolis*, 103 Wn.2d at 61. Conduct in

obtaining clients or increasing profits, including conflicts of interest, fall within the

purview of the Consumer Protection Act. *Eriks v. Denver*, 118 Wn.2d 451, 464-65, 824

P.2d 1207 (1992). Nevertheless, claims of legal negligence or malpractice remain

exempt from the Consumer Protection Act since these claims relate to the competence of

and the strategy employed by lawyers. *Eriks v. Denver*, 118 Wn.2d at 464. Whether

legal counsel acted for entrepreneurial purposes is a question of fact. *Eriks v. Denver*,

118 Wn.2d at 465.

I deem the failure to forward an offer of settlement as generally entailing legal

33

malpractice, but we conclude that, when the client forwards evidence that the attorney

failed to forward the settlement to increase fees, the attorney's neglect entails the

entrepreneurial aspect of the practice. Many of the other acts, about which Steve and

Leticia Miller complain and support with evidence, also involved entrepreneurial aspects

of the practice of law.

*Issue 3: Did the Millers present evidence sufficient to create a question of fact as*

*to whether Drew Dalton's alleged unfair or deceptive acts and practices impacted the*

*public interest?*

*Answer 3: Yes.*

The purpose section of the Consumer Protection Act, buried in RCW 19.86.920,

states, in relevant part:

> It is . . . the intent of the legislature that this act shall not be
> construed to prohibit acts or practices which . . . are not injurious to the
> public interest.

This language forms the basis for the third element of a private Consumer Protection Act

claim. *Hangman Ridge Training Stables, Inc. v. Safeco Title Insurance Co.*, 105 Wn.2d

at 788 (1986). The trial court dismissed Steve and Leticia Miller's Consumer Protection

Act claim based on a failure to show Drew Dalton's conduct impacted the public interest.

Since the inception of the private cause of action, the Consumer Protection Act has

spawned significant litigation over what conduct impacts the public interest, with

Washington courts construing this element narrowly. Under earlier Washington case

34

law, a breach of a private contract affecting no one but the parties to the contract did not affect the public interest. *Lightfoot v. MacDonald*, 86 Wn.2d 331, 334, 544 P.2d 88 (1976). Nevertheless, the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion can change a factual pattern from a private dispute to one that affects the public interest. *McRae v. Bolstad*, 101 Wn.2d 161, 166, 676 P.2d 496 (1984). An act or practice impacted the public interest when (1) it was part of a pattern or generalized course of conduct, and (2) there was a real and substantial potential for repetition of the defendant's conduct after the act involving plaintiff. *Eifler v. Shurgard Capital Management Corp.*, 71 Wn. App. 684, 697, 861 P.2d 1071 (1993).

In 2009, the Washington Legislature adopted RCW 19.86.093 to delineate methods by which a Consumer Protection Act claimant may demonstrate the defendant's conduct impacted the public interest. The statute declares:

> In a private action in which an unfair or deceptive act or practice is alleged under RCW 19.86.020, a claimant *may establish* that the act or practice is injurious to the public interest because it:
> (1) Violates a statute that incorporates this chapter;
> (2) Violates a statute that contains a specific legislative declaration of public interest impact; or
> (3)(a) Injured other persons; (b) had the capacity to injure other persons; or (c) has the capacity to injure other persons.

RCW 19.86.093 (emphasis added). Presumably the word "may" denotes an intent to render the list of methods to prove the public interest element nonexhaustive. Since the 2009 enactment, most litigation has proceeded as if the statute did not exist.

35

Steve and Leticia Miller contend that Drew Dalton's insistence on the Millers' procuring a loan carrying thirteen percent interest establishes a per se public interest impact because the conduct violated the usury statute. Nevertheless, as already indicated, the Millers never agreed to a loan with thirteen percent interest, so Dalton did not breach the statute.

Steve and Leticia Miller presented no evidence that Drew Dalton repeated his conduct with other clients such that his acts or practices actually injured others. So I focus on whether Dalton's alleged unfair and deceptive acts and practices had or has the capacity to injure others. RCW 19.86.093 aids none in resolving this question. The parties do not assist either because neither party cites the statute.

I observe some conflicting principles of statutory construction in the context of RCW 19.86.093. On the one hand, I do not assume that the legislature intended to significantly change the law by implication. *Sherman v. Kissinger*, 146 Wn. App. 855, 869, 195 P.3d 539 (2008). On the other hand, in construing a statute which reenacts a statute with certain changes in the wording, a change in legislative purpose must be presumed. *Graffell v. Honeysuckle*, 30 Wn.2d 390, 399, 191 P.2d 858 (1948). A presumption carries in all changes in statute law that the legislature recognized a mischief and a remedy. *Graffell v. Honeysuckle*, 30 Wn.2d at 400. In such instances, the legislature must have intended some significant change in the law. *Graffell v. Honeysuckle*, 30 Wn.2d at 400.

36

I discern a significant change in the law by the adoption of RCW 19.86.093. The claimant now need only show the defendant's conduct carried the capacity to injure others. The claimant need no longer demonstrate any injury to another customer or client. The claimant need no longer prove a pattern or generalized course of conduct. The plaintiff need no longer establish a real and substantial potential for or likelihood of repetition.

RCW 19.86.093 still contains an ambiguity. We notice two possible varying interpretations of the statute. The language ". . . an unfair or deceptive act or practice . . . had the capacity to injure other persons" could mean, on the one hand, a broad interpretation that the nature of the acts were such that the defendant could repeat those acts to the injury of others or, on the other hand, a narrow interpretation that the specific acts directed toward the plaintiff could have injured others.

In this appeal, the ambiguity in RCW 19.86.093 poses two distinct and disparate factual questions for the trier of fact. First, under the broad construction, whether Drew Dalton could also misrepresent his experience, could engage in strong-arm billing practices, could mislead as to the role of co-counsel or an expert, could attempt to change his compensation package, could fail to forward a settlement offer, and could hold a conflict of interest in continued representation of a client to the detriment of another client? Second, under the narrow reading, whether Drew Dalton's misrepresentation of his experience to Steve and Leticia Miller, his engagement of strong-arm billing practices

with the Millers, his failure to forward SunTrust Mortgage's settlement offer to the Millers, his concealment from the Millers of a potential conflict in order to increase legal fees, assuming any such acts occurred, injured people other than the Millers. No evidence supports a finding that Dalton's conduct directed at Steve and Leticia Miller damaged any third parties. Nevertheless, I choose the former, broader interpretation because the latter, narrower interpretation would not significantly change earlier Washington case law.

I hesitate in adopting the wider interpretation of RCW 19.86.093 because in some sense all conduct of someone in business has the capacity to be repeated with regard to another client or customer and thereby injure that other client or customer. I construe RCW 19.86.093, however, to exclude from coverage conduct so unique that the chance of repetition toward someone else remains minimal.

I conclude that Steve and Leticia Miller presented evidence that allowed a trier of fact to resolve whether unfair and deceptive acts or practices of Drew Dalton had the capacity to injure others. The type of misconduct shown by the testimony could readily be repeated with other clients.

*Issue 4: Whether the Millers presented evidence to support a question of fact as to whether the conduct of Drew Dalton caused them injury in their business or property?*

*Answer 4: Yes.*

I conclude that Steve and Leticia Miller presented evidence that, assuming the

38

evidence to be true, demonstrated an injury to their interest in their home, property and financial affairs. A person's financial injury constitutes damage to business or property under the Consumer Protection Act. *Cuevas v. Montoya*, 48 Wn. App. 871, 878-79, 740 P.2d 858 (1987). Drew Dalton does not argue to the contrary.

Comparative Fault

*Issue5: Whether sufficient evidence supported a jury instruction that would direct the jury to assess comparative fault, if any, of Steve and Leticia Miller?*

*Answer 5: No.*

This lead opinion returns to being the majority opinion. Drew Dalton assigns error to the trial court's refusal to permit the jury to assess comparative fault against Steve and Leticia Miller. Contributory negligence or comparative fault can be a defense in an attorney malpractice suit. *Stiley v. Block*, 130 Wn.2d 486, 503-04, 925 P.2d 194 (1996); *Hansen v. Wightman*, 14 Wn. App. 78, 86, 538 P.2d 1238 (1975). The attorney holds the burden to show comparative fault. *Hansen v. Wightman*, 14 Wn. App. at 86. The fiduciary or unique relationship between an attorney and a client may limit the duties of a client to act reasonably and thereby impact the scope of comparative fault by the client. *Hansen v. Wightman*, 14 Wn. App. at 86.

Washington's contributory fault statute applies only to actions for "injury or death to person or harm to property." RCW 4.22.005. An attorney malpractice suit does not entail physical injury or damage to person or property. Thus, any contributory

39

negligence of the client might function as an absolute bar to recovery in a legal malpractice suit. *Gorski v. Smith*, 2002 Pa. Super 334, 812 A.2d 683 (2002). We need not address this question.

This court reviews a trial court's refusal to give a proposed jury instruction for an abuse of discretion. *State v. Picard*, 90 Wn. App. 890, 902, 954 P.2d 336 (1998). A court must instruct the jury on a party's position if substantial evidence supports the position. *Langan v. Valicopters, Inc.*, 88 Wn.2d 855, 866, 567 P.2d 218 (1977). We conclude substantial evidence did not support any instruction on comparative fault.

In his brief, Drew Dalton impliedly contends that Steve Miller's purchase of a truck that cost $50-60,000 and Miller's investing of some of the proceeds from the Bank of Whitman loan into the stock market constituted comparative fault. Nevertheless, Dalton provides no analysis as to the purported unreasonableness of Miller's two acts. Dalton claims that Steve Miller purchased the truck after he knew he may encounter financial woes, but the only evidence shows that Miller purchased the truck in 2006, two years before the loan. No witness opined that investing money in the stock market is unreasonable.

RAP 10.3(a)(6) directs each party to supply, in his brief, "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." We do not consider conclusory arguments that are unsupported by citation to authority. *Joy v. Department of Labor & Industries*, 170 Wn.

App. 614, 629, 285 P.3d 187 (2012). Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration. *West v. Thurston County*, 168 Wn. App. 162, 187, 275 P.3d 1200 (2012); *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998).

All of the alleged negligent conduct of Steve Miller occurred years before Steve and Leticia Miller hired Drew Dalton for assistance. We also conclude that conduct that led to a client's financial problems cannot be considered comparative fault in a claim by the client against an attorney hired to assist in relieving the client from the predicament.

The client's alleged negligence must relate to the injury alleged to have been caused by the attorney's negligence and must relate to the attorney's representation. *McLister v. Epstein & Lawrence, PC*, 934 P.2d 844, 846 (Colo. App. 1996). For example, a comparative negligence instruction may be based on evidence that the client: (1) failed to supervise, review, or inquire as to the representation, (2) refused to follow advice or instructions, (3) failed to provide the attorney with essential information, (4) failed to mitigate damages caused by the lawyer's negligence, or (5) interfered with the attorney's representation. *McLister v. Epstein & Lawrence, PC*, 934 P.2d at 846. The attorney may not rely on the negligence of the client preceding the attorney's engagement. *McLister v. Epstein & Lawrence, PC*, 934 P.2d at 846. Drew Dalton's theory of comparative fault against the Millers would permit a physician to employ comparative fault against a patient for the patient's negligence in causing an automobile

41

accident when the patient sues the physician for failing to properly set a broken bone

resulting from the accident.

In *McLister v. Epstein & Lawrence, PC*, 934 P.2d 844 (Colo. App. 1996), the

reviewing court reversed the trial court's delivery of a jury instruction allowing the jury

to assess comparative fault on the client in an attorney malpractice case. The client sued

the attorneys for negligent representation during a worker compensation proceeding. The

attorneys sought reduction of any award on the basis of comparative fault because the

client failed to purchase worker compensation insurance. The attorneys knew the client

lacked insurance when the attorneys agreed to represent him.

Economic Damages Award

*Issue 6: Was the jury award of $496,000 outside the realm of the evidence?*

*Answer 6: Yes.*

We now address challenges that impact the jury award. Drew Dalton assigns error

to the trial court's denial of a motion for a new trial or for a remittitur because the jury's

award of damages for negligence exceeded the difference between Steve and Leticia

Miller's present economic condition and the condition, in which they would have been,

absent Dalton's negligence. We agree with Dalton that the award for damages exceeded

a permissible maximum even when viewing the evidence in a light most favorable to the

Millers.

A jury damage award should be overturned only if (1) the award lies outside the

42

range of the evidence, (2) the jury was obviously motivated by passion or prejudice, or (3) the verdict amount is shocking to the court's conscience. *Hill v. GTE Directories Sales Corp.*, 71 Wn. App. 132, 138, 856 P.2d 746 (1993). Although Drew Dalton also argues that passion influenced the jury award, we focus on Dalton's argument that the award lay outside the evidence.

When the proponent of a new trial argues that the evidence does not sustain the verdict, appellate courts review the record to determine whether sufficient evidence supports the verdict. *McUne v. Fuqua*, 45 Wn.2d 650, 652, 277 P.2d 324 (1954). In doing so, we also determine whether the verdict conflicts with law. CR 59(a)(7). The trial court abuses its discretion when denying a motion for a new trial when the verdict diverges from the evidence. *Palmer v. Jensen*, 132 Wn.2d 193, 198, 937 P.2d 597 (1997).

This appeal demands review of an award for economic damages. The law probably defers more to a jury in assessing noneconomic damages than economic damages. *Washburn v. Beatt Equipment Co.*, 120 Wn.2d 246, 269, 840 P.2d 860 (1992). This preference results from pain and suffering not being susceptible to precise measurement and being unable to be fixed with mathematical certainty by the proof. *Wagner v. Monteilh*, 43 Wn. App. 908, 912, 720 P.2d 847 (1986).

A prevailing claimant in a legal malpractice suit may recover the amount of loss actually sustained as a proximate cause of the attorney's conduct. *Schmidt v. Coogan,*

43

181 Wn.2d 661, 670, 335 P.3d 424 (2014). Stated differently, a plaintiff is entitled to the sum of money that will place her in as good of a position as she would have been but for the attorney's breach of the standard of care. *Shoemake v. Ferrer*, 168 Wn.2d 193, 198, 225 P.3d 990 (2010). A plaintiff should be made whole without conferring a windfall. *Shoemake v. Ferrer*, 168 Wn.2d at 198. This measure of damages parallels the standard tort measure of damages. *Puget Sound Power & Light Co. v. Strong*, 117 Wn.2d 400, 403, 816 P.2d 716 (1991).

The trial court permitted no recovery for emotional distress damages. Therefore, all damages constituted economic loss. We accept Drew Dalton's surmise that the jury reached the $496,000 award on the negligence claim by starting with the amount of the judgment in favor of SunTrust Mortgage against Steve and Leticia Miller plus interest through trial, an amount of $566,086, and subtracting the mortgage payments that Steve and Leticia Miller would have paid from the date they would have accepted the loan modification until trial, an amount of $69,529. We note that the subtraction homework equals $496,557, not $496,000, but we call the result close enough. Regardless, the evidence does not support a loss of $496,000. Under the law, the Millers were not entitled to recovery of the judgment against them in favor of SunTrust minus the mortgage payments saved through the date of trial.

If Drew Dalton had forwarded the settlement offer to Steve and Leticia Miller and the Millers had accepted the offer, the Millers would have been absent a judgment against

44

them, would have continued to own a home, but would have continued to owe a mortgage on the home. Therefore, the measure of damages should be the difference between the value of the home and the amount of the mortgage. In other words, the jury should have limited the award to the lost equity in the Rockford residence. The jury awarded the Millers the financing costs to build the home without recognizing an encumbrance owed on the home.

Drew Dalton's violation of the standard of care resulted in Steve and Leticia Miller losing refinancing. Stated differently, the Millers lost the issuance of a loan on new terms. We analogize to cases, in which the claimant seeks recovery for a breach of a promise to loan money. Although the cases sound in contract, they seek damages resulting from lost financing or refinancing. One such case also mentions the equivalent measure applies when the failure to issue the loan resulted from negligence. *F.B. Collins Investment Co. v. Sallas*, 260 S.W. 261, 265 (Tex. Civ. App. 1924).

In cases involving violation of a promise to lend, the courts allow recovery based on actual loss. *F.B. Collins Investment Co. v. Sallas*, 260 S.W. at 265. In turn, the general measure of damages for a breach of an agreement to lend money at a particular time is the amount of the difference between interest on the loan at the contract rate and at the rate which the borrower would have to pay for the money in the market. *United California Bank v. Prudential Insurance Company of America*, 140 Ariz. 238, 681 P.2d 390, 448 (Ct. App. 1983); *F.B. Collins Investment Co. v. Sallas*, 260 S.W. at 264; *Hedden*

45

*v. Schneblin*, 126 Mo. App. 478, 104 S.W. 887, 890 (1907). Ordinarily the measure of damage resulting from a lost loan is the excess interest paid on a substitute loan and perhaps the expense attending to negotiation of another loan. *Farm Credit Services of Michigan's Heartland, PCA. v. Weldon*, 232 Mich. App. 662, 591 N.W.2d 438, 447 (1998); *Hixson v. First National Bank of New Sharon*, 198 Iowa 942, 200 N.W. 710, 711 (1924).

A different rule prevails if the potential borrower loses title to the property as a result of the breach of promise to lend. When the prospective borrower loses title to the property at a foreclosure sale as a result of the failure to lend money particularly when the purpose of the loan was to pay off prior encumbrances, the measure of damages is the difference between the fair market value of the property and the amount of the liens on the property. *Farm Credit Services of Michigan's Heartland, PCA v. Weldon*, 591 N.W.2d at 447; *United California Bank v. Prudential Insurance Company of America*, 681 P.2d at 448; *St. Paul at Chase Corp. v. Manufacturers Life Insurance Co.*, 262 Md. 192, 241-42, 278 A.2d 12 (1971); *F.B. Collins Investment Co. v. Sallas*, 260 S.W. at 264-65 (Tex. Civ. App. 1924); *Hedden v. Schneblin*, 104 S.W. at 888-89 (1907); *Doushkess v. Burger Brewing Co.*, 20 A.D. 375, 47 N.Y.S. 312, 314-15 (1897). In other words, the damages constitute the lost equity in the property. *Hopewell Building Co. v. Callan*, 200 A.D. 588, 193 N.Y.S. 504, 508 (1922). The injured party may not recover the full value of the land independent of the encumbrance on the land. *F.B. Collins Investment Co. v.*

46

*Sallas*, 260 S.W. at 265. After all, regardless of the breach, the landowner must pay the lien indebtedness. *F.B. Collins Investment Co. v. Sallas*, 260 S.W. at 265. Legally the property owner only loses the value of the land. *United California Bank v. Prudential Insurance Company of America*, 681 P.2d at 448 (1983). In a similar vein, in Washington, when a financing company refused to lend to a property owner, the owner was entitled to recover the fair market value of a completed building on the property minus the expense of purchasing the land and constructing the building. *Lincor Contractors, Ltd. v. Hyskell*, 39 Wn. App. 317, 323, 692 P.2d 903 (1984).

Steve and Leticia Miller argue that the jury awarded them sufficient funds to save their home from foreclosure. But the funds awarded by the jury would allow the Millers to pay the house in full without any mortgage. Nevertheless, had Drew Dalton complied with the standard of care, the Millers would have still owed a mortgage debt. The Millers further observe that they must pay the entire judgment to save the home from foreclosure and so they characterize their damage as the inability to pay the entire mortgage immediately. But even if SunTrust Mortgage takes title by a foreclosure sale, the Millers did not lose the entire value of the home. They are then excused from paying the large mortgage debt. The acceleration of the entire amount owed under the mortgage by the creditor does not change the measure of damages. In cases we cite above, the failure to lend led to a foreclosure sale whereat the borrower would have needed to pay the entire amount of a debt in order to save the property from foreclosure.

47

We note that Steve and Leticia Miller filed bankruptcy and thereby prevented foreclosure on the deed of trust by SunTrust Mortgage. For all we know, the Millers may eventually be able to garner a satisfactory payment schedule through the bankruptcy court in order to keep the Rockford residence. Under the rules above, the Millers should then only recover the additional interest that they might pay as a result of not entering a settlement with SunTrust Mortgage in May 2012.

Two cases declare that the jury measures the damages at the time of the loss of title. *United California Bank v. Prudential Insurance Company of America*, 681 P.2d 390 (1983); *F.B. Collins Investment Co. v. Sallas*, 260 S.W. 261 (Tex. Civ. App. 1924). This rule may echo the Washington rule that the correct measure of damages in cases involving stolen or destroyed property is the property's highest fair market value within a reasonable amount of time from the date of conversion or injury. *Glaspey v. Prelusky*, 36 Wn.2d 592, 595, 219 P.2d 585 (1950); *Brougham v. Swarva*, 34 Wn. App. 68, 75-76, 661 P.2d 138 (1983).

We encounter difficulty in accurately computing economic damages suffered by Steve and Leticia Miller for several reasons. First, the prevailing, if not universal rule, is that damages are measured at the time of the foreclosure or loss of title under the situation when the borrower fails to gain substitute financing. Yet, because of the Millers' bankruptcy, SunTrust Mortgage has not yet wrested title from Steve and Leticia Miller. Conceivably, Steve and Leticia Miller will save their home from foreclosure

through bankruptcy protection that may procure refinancing. If so, the measure of damages is the expense of refinancing and the additional, if any, interest paid by the Millers over the life of the new loan above the interest they would have paid under the May 2012 offer from SunTrust Mortgage. We do not know these figures.

If Steve and Leticia Miller lose title, their damages would consist of the equity in the home at the time of lost title. Paul Murray valued the Rockford home between $620,000 and $650,000, but only if completed as planned. In its unfinished state at the time of trial, according to Murray, the home's value ranged from $555,000 to $575,000. *Lincor Contractors, Ltd. v. Hyskell*, 39 Wn. App. 317 (1984), allows recovery based on the value of the building in its completed state, but the trier of fact must deduct the cost of completion from the value. No one testified to the cost to complete the Millers' residence. Also, Murray probably testified to the value at the time of trial, not the value at any prospective time of foreclosure. We later address the ramifications of these obstacles of assessing damages when discussing the remedy to grant Drew Dalton.

*Issue 7: Whether Drew Dalton waived a challenge on appeal to the amount of the jury award because he failed to object to jury instruction 9?*

*Answer 7: No.*

Steve and Leticia Miller ask that we refuse to address Drew Dalton's assignment of error to the jury award. The Millers contend that Dalton waived any challenge to the award because Dalton registered no objection to the jury charge that directed the jury

how to measure damages. The subject instruction, instruction 9, in part bade the jury to "consider the amount of economic loss actually sustained and the award necessary to restore Steve and Leticia Miller to the position they would have been in if Drew Dalton had met the standard of care." CP at 815.

We disagree that Drew Dalton needed to object to this instruction. The instruction correctly advised the jury as to the measure of damages, so any objection would lack merit. Dalton, on appeal, does not object to the jury instruction, but complains that the evidence, in light of the legal instruction, failed to substantiate the high award. Dalton contends that the jury verdict exceeded the need to restore Steve and Leticia Miller to the position they would have enjoyed if Dalton had complied with the standard of care. The Millers cite no authority to support waiver of an assignment of error under these circumstances.

*Issue 8: What relief should we award Drew Dalton as a result of the jury verdict exceeding the evidence?*

*Answer 8: Because of the difficulty in assessing a remittitur and because we grant a new trial on other issues, we grant Drew Dalton a new trial as to damages but not for his legal malpractice.*

Before the trial court, Drew Dalton requested a new trial or, in the alternative, a remittitur reducing the jury award to either $140,000 or $268,000. The trial court refused both requests for relief. Since we have held that the evidence does not support the jury

verdict, we must decide whether to award a new trial or a remittitur. We grant a new trial

without a remittitur.

    *Black's Law Dictionary* defines remittitur as:

> An order awarding a new trial, or a damages amount lower than that
> awarded by the jury, and requiring the plaintiff to choose between those
> alternatives.

BLACK'S LAW DICTIONARY 1486 (10th ed. 2014). A remittitur's antonym is an additur,

whereby the court awards a higher sum of money than the verdict.

    RCW 4.76.030 controls remittiturs in Washington State. The statute declares:

> If the trial court shall, upon a motion for new trial, find the damages
> awarded by a jury to be so excessive or inadequate as unmistakably to
> indicate that the amount thereof must have been the result of passion or
> prejudice, the trial court may order a new trial or may enter an order
> providing for a new trial unless the party adversely affected shall consent to
> a reduction or increase of such verdict . . . .

Although the statute only references verdicts based on passion or prejudice, courts apply

the statute in instances when the jury award lies outside the range of evidence. *Green v.*

*McAllister*, 103 Wn. App. 452, 462, 14 P.3d 795 (2000). An appellate court holds

authority to reduce a jury's damages award under the doctrine of remittitur and under

RCW 4.76.030 if the award is outside the range of substantial evidence in the record.

*Bunch v. King County Department of Youth Services*, 155 Wn.2d 165, 171-72, 116 P.3d

381 (2005).

    CR 59 addresses a motion for new trial. The court rule announces:

**(a) Grounds for New Trial or Reconsideration.** On the motion of the party aggrieved, a verdict may be vacated and a new trial granted to all or any of the parties, and on all issues, *or on some of the issues* when such issues are clearly and fairly separable and distinct, or any other decision or order may be vacated and reconsideration granted. Such motion may be granted for any one of the following causes materially affecting the substantial rights of such parties:

(1) Irregularity in the proceedings of the court, jury or adverse party, or any order of the court, or abuse of discretion, by which such party was prevented from having a fair trial;

. . . .

(5) Damages so excessive or inadequate as unmistakably to indicate that the verdict must have been the result of passion or prejudice;

. . . .

(7) That there is no evidence or reasonable inference from the evidence to justify the verdict or the decision, or that it is contrary to law.

(Emphasis added.)

We recognize that the law encourages the trial court, if not a reviewing court, to increase or reduce a verdict as an alternative to a new trial. *Usher v. Leach*, 3 Wn. App. 344, 346, 474 P.2d 932 (1970). A remittitur or additur avoids multiple trials. *Benjamin v. Randell*, 2 Wn. App. 50, 53-54, 467 P.2d 196 (1970). Nevertheless, we choose a new trial because we are unable to compute a reasonable amount for a remittitur.

In *Mutual of Enumclaw Insurance Co. v. Gregg Roofing, Inc.*, 178 Wn. App. 702, 726-27, 315 P.3d 1143 (2013), this court declined to grant a remittitur because both the trial court and it encountered difficulty based on the record in calculating permissible damages. Because the evidence did not justify the damage, however, the court granted a new trial on damages.

The court can leave the jury's liability verdict intact and order a new trial on the issue of damages only. CR 59(a); *Mutual of Enumclaw Insurance Co. v. Gregg Roofing, Inc.*, 178 Wn. App. at 727; *Green v. McAllister*, 103 Wn. App. at 462 (2000). We do not grant Drew Dalton a new trial on the issue of his liability for legal malpractice. The award for breach of fiduciary duty also stands.

Emotional Distress Damages

*Issue 9: Whether Steve and Leticia Miller presented sufficient evidence, in response to a summary judgment motion, to proceed with a claim for emotional distress damages on their legal malpractice suit?*

*Answer 9: Yes.*

Steve and Leticia Miller contend the trial court erred in dismissing their claim for emotional distress damages on summary judgment. Courts review an order for summary judgment de novo. *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015).

Four years ago the Washington Supreme Court addressed emotional distress damages in the context of attorney malpractice in *Schmidt v. Coogan*, 181 Wn.2d 661 (2014). The majority held:

> [w]e hold that the plaintiff in a legal malpractice case may recover emotional distress damages when significant emotional distress is foreseeable from the sensitive or personal nature of representation or when the attorney's conduct is particularly egregious.

53

*Schmidt v. Coogan*, 181 Wn.2d at 671. The court later added intentional conduct as qualifying for emotional distress damages.

*Schmidt v. Coogan* entailed ordinary negligence of an attorney. The attorney filed a tort complaint on behalf of Teresa Schmidt days before the statute of limitations ran. The attorney named the wrong defendant and the court dismissed the case as barred by the statute of limitations. Schmidt complained that her attorney harassed, belittled, and intimidated her when she questioned him about the statute of limitations before the limitation period expired. The court concluded that the subject matter of the lawsuit did not qualify as sensitive and the misconduct of the attorney did not suffice as egregious.

The *Schmidt* court understandably gave no guidelines for determining whether an attorney's negligence impacts a personal or sensitive subject or constitutes egregious behavior. The dissent, in *Schmidt*, quoted *Black's Law Dictionary* 629 (10th ed. 2014) as defining "'egregious'" as "'extremely or remarkably bad.'" *Schmidt v. Coogan*, 181 Wn.2d at 687 (2014) (Stephens, J. dissenting). The dissent considered the attorney's ridicule of Teresa Schmidt for failing to trust him about fulfilling the statute of limitations as "'remarkably bad.'" *Schmidt v. Coogan*, 181 Wn.2d at 687.

Drew Dalton argues no Washington court has affirmed emotional distress damages in this appeal's context and he highlights a Vermont Supreme Court decision, *Vincent v. DeVries*, 2013 Vt. 34, 193 Vt. 574, 72 A.3d 886. The *Schmidt* court relied on *Vincent* when declaring Teresa Schmidt's attorney's behavior as not egregious. In *Vincent*, an

54

elderly man, Leland Vincent, almost lost his home because of his attorney's negligence. Vincent sought to avoid the enforcement of an agreement to sell his home. When the buyer sued to enforce the sale agreement, Vincent hired Douglas DeVries to defend the suit. DeVries stipulated that the dispute could be resolved by summary judgment, but DeVries never forwarded a declaration of Vincent of the circumstances preceding the signing of the sale agreement, which circumstances could support a defense of fraud or misrepresentation. After the trial court granted the buyer summary judgment to enforce the sale, DeVries sought to vacate the judgment with a declaration from Vincent. The court refused to entertain the vacation because of the earlier stipulation. Vincent then paid the buyers a significant sum to cancel the sale, and Vincent sued DeVries for malpractice.

In reversing the trial court's decision to award emotional damages on a malpractice claim, the Vermont court, in *Vincent v. DeVries*, noted:

> [P]laintiff here did not lose his home but, rather, faced a threatened loss of his home which he ultimately avoided by settling the case. We do not mean to suggest that the anxiety associated with the threatened loss of one's home cannot be profound. But in contrast to the loss of liberty or one's child—very significant losses for which there may be no adequate measure of pecuniary damages, and in connection with which serious emotional distress can be readily expected—what plaintiff ultimately lost in this case was money.

*Vincent v. DeVries*, 193 Vt. at 589. In so ruling, the court focused only on whether the subject of the lawsuit involved a matter personal or emotional in nature. The Vermont

court did not focus on the egregious or trifling nature of the misconduct of the attorney.

We note additional anxiety producing behavior of attorney Drew Dalton than the ordinary negligence of the Vermont attorney in *Vincent v. DeVries*. But more importantly we recognize the pronounced and blatant acts of Drew Dalton as presented in the testimony of Steve Miller. The type of conduct described by Steve Miller, if believed, gives lawyers a bad name. Dalton entered a contingent fee agreement with his clients but could never produce a copy. Dalton failed to complete steps necessary to resolve a dispute and then benefited from his negligence or intentional misconduct. He hid critical facts from his clients. He tried to coerce a change in his compensation to his profit. He hired assistants without approval of his clients and without informing them of the true relationship with the assistants. He billed for his hours worked on a contingent fee case.

The trial court dismissed Steve and Leticia Miller's claim for emotional distress damages on summary judgment rather than as a matter of law at the conclusion of trial. Therefore, we must base our review on declarations and deposition testimony presented to the trial court in response to the summary judgment motion. We have reviewed those declarations and deposition excerpts and note their consistency with the trial testimony. The trier of fact should determine if Drew Dalton's behavior was egregious such as to support a claim for emotional distress damages.

Daughters' Testimony of Emotional Distress

*Issue 10: Whether the trial court abused its discretion when allowing the Miller daughters to testify to their emotional distress?*

*Answer 10: No.*

Drew Dalton assigns error to the trial court's admission of testimony from the two Miller daughters about the emotional toll of the delay and failure to garner refinancing from SunTrust Mortgage. Dalton claims the testimony lacked relevance to the issues at trial and that, assuming any relevance, the prejudice resulting from the testimony outweighed any relevance under ER 403. This court reviews a trial court's decision as to the admissibility of evidence under the abuse of discretion standard. *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995).

All relevant evidence is admissible unless limited by statute or constitutional requirements. ER 402. Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." ER 403. When evidence is likely to stimulate an emotional response rather than a rational decision, a danger of unfair prejudice exists. *State v. Powell*, 126 Wn.2d at 264.

Steve and Leticia Miller argued during trial, and on appeal, that their daughters' testimony was relevant because it demonstrated that Steve Miller would not have risked losing his home to complain to SunTrust Mortgage over $9,000 in escrow fees and back taxes. Thus, the evidence rebutted Drew Dalton's insinuation that Steve Miller did not

want to accept the SunTrust offer for a modified home loan because he did not want to pay additional costs beyond the $1,311.87 monthly mortgage payment. We agree that the daughters' testimony bore some tangential relationship to the parties' dispute.

Whether the daughters' testimony should be excluded under ER 403 is a separate question. On remand, we direct the trial court to address possible exclusion of the testimony under ER 403. We note that Dalton cites to no case that precludes "innately" emotional testimony from a minor. We further observe that, at the time of the trial court's permission of the testimony of the daughters, the trial court had previously ruled that Steve and Leticia Miller may not recover emotional distress damages. We have reversed this ruling. The emotional distress suffered by the daughters may have impacted the mental wellbeing of the parents such that the daughters' testimony is relevant for this additional purpose. Finally, Drew Dalton complains that allowing the daughters' testimony impacted the jury award. Since we vacate the award of economic damages and limit the amount of the award on remand, we allay the danger of an award based on an emotional response by the jury to the testimony. The trial court should consider these factors when weighing whether any prejudice from the testimony outweighs its probative value.

### Mitigation of Damages

*Issue 11: Did the trial court err when refusing to instruct the jury on a failure to mitigate damages?*

58

No. 35163-7-III
*Miller v. Dalton*

*Answer 11: We do not address this question because Drew Dalton does not properly assign error to the failure to instruct the jury and Dalton presented the trial court no jury instruction on mitigation of damages.*

Drew Dalton assigns error to the trial court's failure to render a jury instruction that permitted the jury to lower any damage award based on Steve and Leticia Miller's failure to mitigate damages. Nevertheless, in the assignment of error Dalton fails to reference his proposed instruction number that the trial court purportedly rejected. The first sentence of RAP 10.3(g) declares:

> **Special Provision for Assignments of Error**. A separate assignment of error for each instruction which a party contends was improperly given or refused must be included with reference to each instruction or proposed instruction by number.

Drew Dalton may have omitted, in his assignment of error, a reference to a proposed jury instruction on the defense of failure to mitigate damages because he never proposed one at trial. He proposed an instruction for contributory negligence, but the instruction fails to reference failure to mitigate. Also, Dalton's proposed verdict form allows the jury to assess comparative fault but does not include language for reduction of damages due to a failure to mitigate. To challenge the trial court's failure to give a jury instruction, an appellant must have proposed the instruction in the trial court. *McGarvey v. City of Seattle*, 62 Wn.2d 524, 533, 384 P.2d 127 (1963); *Gorman v. Pierce County*, 176 Wn. App. 63, 86, 307 P.3d 795 (2013). We decline review of Drew Dalton's last

59

No. 35163-7-III
*Miller v. Dalton*

assignment of error.

CONCLUSION

We vacate the jury's award for damages for Drew Dalton's negligence, but affirm the finding of liability and the jury award for breach of fiduciary duty. We affirm dismissal of the claims under the Consumer Protection Act, but reverse dismissal of the claim for emotional distress damages. We remand for a new trial consistent with this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

I CONCUR (Except as to Consumer Protection Act analysis):

_____
Lawrence-Berrey, C.J.

60

No. 35163-7-III

SIDDOWAY, J. (concurring) — I concur in the lead opinion on all issues other than the Millers' assignment of error to the trial court's dismissal of Steve and Letitia Millers' Consumer Protection Act (CPA)[1] claim following the close of the Millers' case. On that issue, I write here for the majority.

A plaintiff alleging injury under the CPA must establish all of its elements. *Michael v. Mosquera-Lacy*, 165 Wn.2d 595, 602, 200 P.3d 695 (2009). As explained by the lead opinion, they are (1) an unfair or deceptive act or practice (2) in the conduct of trade or commerce (3) which impacts the public interest (4) injury to the plaintiffs in their business or property and (5) a causal link between the unfair or deceptive act and the injury suffered. Lead opinion at 29 (citing *Mason v. Mortg. Am., Inc.*, 114 Wn.2d 842, 852, 792 P.2d 142 (1990)). As the lead opinion points out, the required element that the complained-of act or practice impacts the public interest is based on the legislature's declared purpose in adopting the CPA. While providing that the act "shall be liberally construed that its beneficial purposes may be served," the legislature added

> *It is, however, the intent of the legislature that this act shall not be construed to prohibit acts or practices* which are reasonable in relation to the development and preservation of business *or which are not injurious to the public interest*, nor be construed to authorize those acts or practices which unreasonably restrain trade or are unreasonable per se.

---

[1] Ch. 19.86 RCW.

RCW 19.86.920 (emphasis added).

In this action by the Millers against Drew Dalton and his law firm, the trial court always questioned the sufficiency of the Millers' evidence in support of the public interest element of their CPA claim. Although it denied Mr. Dalton's motion for summary judgment dismissal of the claim several weeks before trial, it explained that its decision was based on case law recognizing that the issue is generally one of fact. In orally denying the summary judgment motion, the court told the parties it was skeptical of the CPA claim, "And frankly, as a fact finder, I would remain so, but [that's] not my role today." Report of Proceedings (RP) at 51. Repeating that its initial inclination was to dismiss the claim, it added, "I still may after the plaintiffs' case-in-chief." *Id.* at 51-52.

At the outset of trial, Mr. Dalton sought through a motion in limine to exclude the Millers' proposed damages evidence in support of their CPA claim, pointing out that the Millers never provided information on their CPA damages in response to an interrogatory requesting the information. The court agreed that the information had not been disclosed in response to discovery but denied the motion, finding that the $8,500 in fees that the Millers claimed as damages proximately caused by violations of the CPA were not a surprise. The fees had been identified by the Millers' expert on malpractice issues. In denying the motion in limine, the court stated that any confusion about which damages were proximately caused by CPA violations could be dealt with through interrogatories to the jury "and that is even if the Consumer Protection Act claim makes it past a motion to dismiss. And I'll be listening carefully to that." RP at 204.

Despite the trial court's warnings about the apparent weakness in the Millers' evidence of a public interest impact, the Millers offered no evidence in their case that bore on the probability that Mr. Dalton's complained-of deceptive acts had the capacity to injure the public. Evidence bearing on the probability of a consequential fact is the definition of "relevant evidence." *See* ER 401.[2] None of the Millers' witnesses testified to anything relevant to that issue—e.g., evidence about Mr. Dalton's prior practice of law or that of his firm, or even about his or his firm's later practice or plans. Only two of the Millers' witnesses—their expert on malpractice issues and Steve Miller—knew anything at all about Mr. Dalton's legal practice. And neither of them knew about anything other than his dealings with Mr. Miller. The Millers did not even call Mr. Dalton adversely to question him about his history, his future plans, or even whether he believed that his conduct in representing the Millers was proper conduct that he would engage in again.

At the conclusion of the plaintiffs' case, Mr. Dalton argued that of the five elements required to prove a CPA claim, the Millers had failed to present evidence of two: public interest impact and damages. The gist of the Millers' response on the public interest element was:

> [G]iven that, *apparently*, Mr. Dalton wasn't aware of those rules [relating to charging and collecting attorney fees] or didn't apply those rules in this case, that it is very likely that it—it could be repeated. And that's a question for the jury to decide.

---

[2] The rule provides: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

3

RP at 776 (emphasis added). The trial court reserved ruling on the motion, but

commented:

> [I]t seems to me that there's got to be at least some quantum of evidence
> that bears directly on that issue of the capacity—well, that it—there's a
> capacity to affect the public interest rather than speculating that, well, an
> inexperienced attorney might do this again.

RP at 777. On the morning before instructing the jury, the court announced that it would

grant Mr. Dalton's motion and dismiss the CPA claim.

We review a trial court's decision on a CR 50(a) motion for judgment as a matter

of law using the same standard as the trial court. *Schmidt v. Coogan*, 162 Wn.2d 488,

491, 173 P.3d 273 (2007). A motion for judgment as a matter of law admits the truth of

the opponent's evidence and all reasonable inferences that can be drawn from it. *Queen*

*City Farms, Inc. v. Cent. Nat'l Ins. Co.*, 126 Wn.2d 50, 98, 882 P.2d 703 (1994).

"Granting a motion for judgment as a matter of law is appropriate when, viewing the

evidence most favorable to the nonmoving party, the court can say, as a matter of law,

there is no substantial evidence or reasonable inference to sustain a verdict for the

nonmoving party." *Sing v. John L. Scott, Inc.*, 134 Wn.2d 24, 29, 948 P.2d 816 (1997).

In *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778,

787, 719 P.2d 531 (1986), our Supreme Court recognized that by requiring a private

plaintiff to make a public interest showing, Washington was in the minority among

jurisdictions with consumer protection acts, and that the inclusion of such an element had

been criticized. Nonetheless, the court stated, "[W]e continue to adhere to our position,"

4

stating that adherence was "mandated by two considerations." *Id.* at 788. The first was the purpose section of the CPA, set forth above, whose language "expresses a clear intent to protect the general public by means of the CPA as a whole." *Id.* The second was that in the 10 years since the Court had first construed the CPA to require a public interest showing, the legislature had taken no action to eliminate the requirement. *Id.* at 789.

In 2009, the legislature *did* take action, by adopting RCW 19.86.093. Rather than eliminate the requirement to show public interest, however, the legislature endorsed the burden of a plaintiff in a private CPA action to show "that the act or practice is injurious to the public interest" by providing examples of how that element can be established. *Id.* RCW 19.86.920's statement of legislative purpose remains unchanged.

We agree with our brother's observation in the lead opinion that we presume every amendment of a statute is made to effect some purpose, and effect must be given to the amended law. *Graffell v. Honeysuckle*, 30 Wn.2d 390, 400, 191 P.2d 858 (1948) (citing 50 AM. JUR. *Statutes* § 275 (1944)). We agree that in enacting RCW 19.86.093, the legislature must have had some objection to the manner in which Washington courts had required a plaintiff to establish injury to the public interest. Review of the legislative history of Substitute Senate Bill 5531, 61st Legislature, Regular Session (Wash. 2009), which effected the change, affirms that legislators found existing case law objectionable, but it does not shed light on how, specifically, they expected to modify a CPA plaintiff's required proof. Testimony at the first committee hearing was to the effect that the consumer plaintiffs' bar hoped the change would lighten the burden of a public interest

5

test that was difficult to meet, and the defense bar was worried about the legislation's breadth. *See* Hr'g on S.B. 5531 Before the S. Labor, Commerce & Consumer Protection Comm., 61st Leg., Reg. Sess. (Wash. Feb. 5, 2009), at 52 min., 0 sec. through 1 hour, 14 min., 34 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://www.tvw.org/watch/?eventID=2009021390.

We do not agree, as our brother says, that *Graffell* requires a court reviewing a legislative amendment to presume "some *significant* change" in the law. *See* lead opinion at 36 (emphasis added). We agree with our brother's observation that in the nine years since the enactment of RCW 19.86.093, the statute has been largely ignored. Most importantly, we disagree with our brother that the statute empowers a jury to find liability absent evidence, as long as it can speculate that a defendant's act or practice is capable of repetition.

We are spared in this case the task of divining the precise change intended by the 2009 legislation. That is because the Millers presented literally no relevant evidence. No evidence was presented as to whether those of Mr. Dalton's complained-of acts that constituted an "entrepreneurial aspect" of practicing law were capable of repetition.[3] One could speculate that the complained-of acts might be repeated. But one could also

---

[3] The Millers also presented no evidence prior to the CR 50(a) motion that Mr. Dalton or someone at his law firm misrepresented his experience with loan modifications under the Home Affordable Mortgage Program (HAMP). At most, they presented evidence that when Mr. Miller contacted Mr. Dalton's partner, Stephen Ford, about representation, Mr. Ford stated that "we just hired a trial attorney, and he's—that knows these matters and he's—has experience in these matters." RP at 584.

speculate from the evidence presented by the close of the Millers' case that Mr. Dalton might have quit practicing law. One could speculate from the Millers' evidence that Mr. Dalton might have sworn off entering into contingent or flat fee agreements. One could speculate that his law firm might have adopted a policy forbidding them. One could speculate about any number of facts that might make it more or less likely that the complained-of acts would be repeated.

We hold with confidence based on RCW 19.86.093's plain language that it continues to be an essential element of a CPA claim that a complained-of act or practice "is injurious to the public interest." We hold with confidence based on the statute's plain language that the element is something that the plaintiff must "establish"—in other words, prove—which means, in a CPA plaintiff's case, presenting relevant evidence amounting to a preponderance. Because the statute requires a CPA plaintiff to present relevant evidence and the Millers presented none, the trial court properly granted judgment as a matter of law.

The dismissal of the CPA claim is affirmed.

_____
Siddoway, J.

I CONCUR:

_____
Lawrence-Berrey, C.J.

7